# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1667-22

IN THE MATTER OF THE
CIVIL COMMITMENT OF
A.E.

_____

Argued February 12, 2024 – Decided February 21, 2024

Before Judges Mawla and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. MNCC-000047-23.

Brian P. Hughes, Assistant Deputy Public Defender, argued the cause for appellant A.E. (Jennifer Nicole Sellitti, Public Defender, attorney; Brian P. Hughes, on the briefs).

Matthew White, Assistant County Counsel, argued the cause for respondent State of New Jersey (Emeshe Arzón, Camden County Counsel, attorney; Krista Ayn Schmid, Assistant County Counsel, on the brief).

PER CURIAM

A.E. appeals from the January 26, 2023 order that continued his involuntary commitment. Based on our review of the record and applicable principles of law, we affirm.

On January 9, 2023, A.E., who was sixty years old at the time, was admitted to Northbrook Behavioral Health Hospital ("Northbrook") in Camden suffering from acute unspecified psychotic disorder. A.E. was experiencing delusions that he was paralyzed. His delusions began after he saw a player sustain an injury while watching a professional football game. On January 10, 2023, a judge entered a temporary order for involuntary commitment. On January 26, 2023, the court conducted a commitment hearing. A.E. applied for immediate discharge. He did not seek Conditional Extension Pending Placement ("CEPP").

Dr. Thomas Campo, A.E.'s treating psychiatrist at Northbrook, testified for the State, and recommended continuing involuntary commitment. Dr. Campo testified A.E. was suffering from a mental illness, unspecified psychotic disorder. At the time of the hearing, A.E. was still experiencing delusions that he had previously been paralyzed but was "somewhat recovered" and suffering "vestigial weaknesses." According to Dr. Campo, A.E. believed "if he [was] on the floor, his limitations [would not] allow him to get up by himself, [and] he

2

[would have] to remain on the floor." During his stay at Northbrook, hospital staff did, in fact, need to help him up from the floor.

A.E. was not suffering from any medical or neurocognitive issues that would cause paralysis or weakness. Dr. Campo was treating A.E. with Risperdal and Gabapentin. Dr. Campo testified A.E. was medication compliant, but A.E. believed he did not need medication. A.E. also believed he needed a defibrillator implanted to help with his medical issues.

Dr. Campo testified A.E. could not attend to his necessary activities of daily living, including general hygiene, without assistance in the hospital due, in part, to his delusions. Dr. Campo testified A.E. had poor insight into his mental illness and believed he was being treated for a medical condition causing his paralysis and weakness.

Although A.E. desired to return to his elderly parents' home where he lived since 1973, his parents advised Northbrook they would not allow him to return until he was stable. Dr. Campo testified that returning A.E. to his parents' home when he was ready was a better option than alternative housing. He explained no less restrictive environment was appropriate at the time, and A.E. was an imminent danger to himself due to his inability to care for himself because of his mental illness. Specifically, Dr. Campo opined that if A.E. was released

A-1667-22

immediately, he would need to go to an emergency shelter and would end up in the emergency room by the end of the day because of his delusions. Dr. Campo believed A.E. was "getting better" and expected A.E. would be released in "another week or so."

A.E. testified he had "a condition in [his] spine. It hits [his] peroneal nerve, so [he] can't get down on the floor and get back up. [He has] to be by a chair. [He] didn't fall down getting up. Nobody helps [him], in [Northbrook], [to] get back up." A.E. also testified, contrary to Dr. Campo's testimony, he showered regularly and cared for himself at Northbrook and never needed assistance to get up from the floor.

Based on Dr. Campo's testimony and written report, the court found the State proved by clear and convincing evidence A.E. suffered from a mental illness, unspecified psychotic disorder. The court also found A.E. suffered "a delusional incident where he believed himself to become paralyzed. He ha[d] since regained some mobility, but he still believe[d] that if he [was] on the ground, he [could] not stand up." The court noted there was no evidence A.E. had a source of income and found A.E. had no place to live other than his parents' home, which was not available to him until his condition improved. It found A.E. would not be able to survive outside the hospital because he would not have

4

a place to live, be able to obtain food, or care for himself. The court concluded A.E. "in his present situation" was not "able to negotiate the basic requirements of life and be able to care for himself." It ordered continued involuntary commitment and scheduled a review hearing for February 16, 2023. On February 7, 2023, A.E. was released.

On appeal, A.E. argues the court erred in not ordering CEPP. In his reply brief, A.E. also argues the State failed to meet its burden to establish involuntary commitment was appropriate. More particularly, A.E. argues the State failed to establish by clear and convincing evidence it was probable he would suffer substantial bodily injury within the foreseeable future.

We review the decision to continue an individual's civil commitment utilizing an abuse of discretion standard. See In re D.C., 146 N.J. 31, 58-59 (1996). When reviewing civil commitment decisions, "we afford deference to the trial court's supportable findings." In re Commitment of T.J., 401 N.J. Super. 111, 119 (App. Div. 2008). We "reverse[] only when there is clear error or mistake." In re Commitment of M.M., 384 N.J. Super. 313, 334 (App. Div. 2006). However, we "must consider the adequacy of the evidence." Ibid.

To continue an individual's involuntary commitment after a temporary commitment order, a court must find "by clear and convincing evidence

5

presented at [a] hearing that the patient is in need of continued involuntary commitment . . . ." R. 4:74-7(f)(1). The Legislature has defined this to mean:

> that an adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to accept appropriate treatment voluntarily after it has been offered, needs outpatient treatment or inpatient care at a short-term care or psychiatric facility or special psychiatric hospital because other services are not appropriate or available to meet the person's mental health care needs.
>
> [N.J.S.A. 30:4-27.2(m).]

A person is "dangerous to self" if:

> by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy [their] need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm, or death will result within the reasonably foreseeable future; however, no person shall be deemed to be unable to satisfy [their] need for nourishment, essential medical care, or shelter if [they are] able to satisfy such needs with the supervision and assistance of others who are willing and available. This determination shall take into account a person's history, recent behavior, and any recent act, threat, or serious psychiatric deterioration.
>
> [N.J.S.A. 30:4-27.2(h).]

A patient who no longer needs involuntary commitment generally must be released within forty-eight hours in accordance with a plan developed by the

6

patient's treatment team. N.J.S.A. 30:4-27.15(b); see also N.J.S.A. 30:4-27.18 (stating the treatment team's obligation with respect to preparation of the plan). CEPP is an exception to the general rule requiring release within forty-eight hours. A CEPP order is proper only when the patient no longer requires involuntary commitment but "is not able to survive in the community independently or with the help of family or friends." In re S.L., 94 N.J. 128, 140 (1983). A judge must make the finding, and the evidence must be adequate to satisfy the judge that CEPP is appropriate. Id. at 140-41.

We are not persuaded by A.E.'s argument that the court erred by continuing his involuntary commitment. A.E. does not dispute his diagnosis of unspecified psychotic disorder, or that his diagnosis qualifies as a mental illness under the statutory scheme. Based on Dr. Campo's testimony, the court found, at the time of the hearing, A.E. would not have been able to survive outside of the hospital because he did not have a place to live and, because of his mental illness, he would not have been able to obtain food or care for himself.

The court also found A.E.'s parents were unwilling to allow him back into their home until he stabilized and there were no other individuals to whom he could turn for assistance. It found A.E. "in his present situation" was not "able to negotiate the basic requirements of life and be able to care for himself." These

7

findings readily established that A.E. was "unable to satisfy his need for nourishment, essential medical care or shelter, so that it [was] probable that substantial bodily injury, serious physical harm, or death [would] result within the reasonably foreseeable future . . ." as required by N.J.S.A. 30:4-27.2(h).  We are satisfied the court's findings were supported by substantial, credible evidence in the record and it did not abuse its discretion by continuing the involuntary commitment.

A.E.'s argument, which was not raised below, that the court was required to order CEPP is misplaced.  CEPP is appropriate only if the patient no longer requires involuntary commitment.  Because we have determined the court correctly continued the involuntary commitment, the court did not err by failing to consider CEPP.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-1667-22